UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Pretium Resources, Inc. Securities Litigation | Master File No. 1:18-cv-08199-LAP<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Aurico Gold Fund LP ("Lead Plaintiff") and additional plaintiffs Nicholas Barnes and David Tucker (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Pretium Resources, Inc. ("Pretium" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Pretium; and (c) review of other publicly available information concerning Pretium.

## INTRODUCTION

1. This is a class action on behalf of persons and entities that acquired Pretium securities between July 21, 2016 and September 6, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Pretium is in the business of acquiring, exploring and developing of precious metal resource properties in the Americas. Its primary business is running the Brucejack Project, or Brucejack Mine, a mine located in northwestern British Columbia and comprised of 4 mining leases and 6 mineral claims currently totaling 3,304 hectares in area. The Brucejack Mine opened commercial mining operations in 2010, but it's path towards opening was mired in controversy.

3. Prior to the class period, Pretium entered into what eventually became a highly public dispute with Strathcona, a mining consultant it hired to conduct an independent verification of Pretium's estimates of the grade of its ore. Ultimately, Pretium and Strathcona

could not agree on the appropriate methodology for conducting such tests, and Strathcona accused Pretium not only of error but fraud.

4. Nonetheless, Pretium pressed on hiring new consultants who prepared a report in 2014 that validated Pretium's preferred methodology. Pretium also designed a detailed and elaborate plan to develop the mine, using that report to determine where, when and how much ground to dig up in order to create a viable mine that could extract high grade ore from the ground, refine it, and sell it on the open market. Pretium obtained all necessary permits and began development in 2015. However, less than a year into development, Pretium drastically changed course, extracting hundreds of thousands of tons of ore more than they had planned, at the cost of hundreds of millions of dollars. Given that they were a pre-revenue mining company that depended entirely on this mine to repay their debts and become profitable, Pretium would only undertake such a drastic change in plans if they had discovered that their original plan was unviable. However, rather than admit their failures, Defendants repeatedly concealed them from investors. What they could not conceal, however, was that they were unable to deliver the high quality ore that they had promised, and as a result, Pretium's stock plummeted as investors realized that it would not deliver its promised results.

**JURISDICTION AND VENUE**

5. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

6. C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28

8. U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the

alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, and the Company's securities are traded within this Judicial District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11. Lead Plaintiff Aurico Gold Fund LP, as set forth in the certification filed on November 6, 2019 (Docket No. 7-2), incorporated by reference herein, purchased Pretium securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Plaintiff Nicholas Barnes, as set forth in the certification attached as Exhibit 1 hereto, purchased Pretium securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Plaintiff Robert Friedman, as set forth in the certification attached as Exhibit 2 hereto, purchased Pretium securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Pretium is incorporated under the laws of British Columbia, Canada with its principal executive offices located in Vancouver, British Columbia, Canada. Pretium's common stock trades on the NYSE exchange under the symbol "PVG."

15. Defendant Joseph Ovsenek ("Ovsenek") has been the President of Pretium since May 2015 and Chief Executive Officer of the Company since January 1, 2017. Prior to May 2015, Defendant Ovsenek was the Executive Vice President of the Company.

16. Defendant Tom S.Q. Yip ("Yip") was the Executive Vice President and Chief Financial Officer of the Company at all relevant times.

17. Defendants Ovsenek and Yip, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pled herein.

## INDUSTRY BACKGROUND

18. Modern gold mining operations such as Pretium's Brucejack Mine extract gold from the ground by mining thousands of tons of rock per day using large drills, and processing that rock in a mill in order to extract the gold. For purposes of the mining industry, and the complaint, "ore" refers to rock that contains sufficient amounts of gold such that it is economically feasible to mine and mill it. The concentration of gold in ore is called a "grade"

and is measured in grams per tonne[1]. The grade of ore is central to the profitability of a mining operation because the costs of mining are largely driven by the amount of mass of ore that is mined, not the amount of gold within that ore. Therefore, it costs little more to mine and mill ore with, for example 10 grams per tonne than 5 grams per tonne, yet the former would yield double the amount of gold, and therefore double the revenue, compared to the latter.

19. Because concentrations of high grade ore can often be located deep under ground, mining companies also incur costs associated with drilling tunnels in order to reach the those pockets of ore. This involves extracting rock from the ground that either has no gold, or an insufficient grade to be profitably milled. Rock that the company mines but does not mill, and therefore must dispose of, is called waste rock. Once the mining company reaches its target area, it excavates and mills the ore. The area from which the company excavates the ore is called a stope. A stope is not necessarily purely ore, but it is a location that contains as much ore as possible.

20. The mining process involves three phases. First, during the exploration phase, the mining company retain an independent expert who will attempt to determine the amount, grade, and distribution of ore within the site. Companies do this by drilling holes from ground level and extracting rock for testing. They will then test the extracted rock for its composition.

21. The purpose of this testing is to identify a "mineral resource" defined under Canadian law "a concentration or occurrence of solid material of economic interest in or on the Earth's crust in such form, grade or quantity that there are reasonable prospects for eventual economic extraction." A mineral resource is categorized into three increasing levels of confidence: inferred, indicated, and measured.

[1] "Tonne" as used herein refers to one metric ton.

22. In addition to mineral resources, Canadian law also defines "mineral reserve". A mineral resource is "the economically mineable part of a Measured and/or Indicated Mineral Resource." That is a mineral reserve is a location that, once mined, is likely to be considered ore. Canadian law designates two degrees of confidence for mineral reserves: proveable reserves and proven reserves, with the latter designated a higher degree of confidence. Reserves or resourrces are measured by the amount of gold, its tonneage, and its grade. So for instance, a mine might ave a "proven mineral reserve of 1.6 million ounces gold (3.3 million tonnes grading 14.5 grams per tonne gold)."

23. After drilling and testing, an independent expert can then identify mineral resources and reserves, and use the results to prepare a technical report and a feasibility study.

24. The technical report and feasibility study that determine the amount, distribution, and grade of ore, and an analysis of whether it can be economically mined. Finally, the expert will prepare a "mine plan" that outlines how the mine can be developed and administered.

25. The mine plan will have two phases: development and production. During the development phase, the mining company will build the mine and the mill. During the production phase, once the mill is online, the company will mine ore and will still continue to develop the mine further. During the development phase, once the company has drilled significant underground tunnels, the mining company will conduct further "infill" tests. These tests are referred to infill because they compensate for the limits of surface testing. Surface testing, because tit takes limited samples, leaves gaps in its model. Infilling tests are additional drilling tests performed in underground areas between where the company administered the surface tests. These tests can be used to modify the estimates of ore, as well as the mine plan.

26. In the course of reaching the ore that is the target of the development, the company may by necessity also drill through some ore during the development phase. The company typically stockpiles the ore until it can process the ore through the mill. Typically, the mining company will aim to have the mine completed before the mill, because if the mine is completed first, the company can stockpile ore, while if the company finishes the mill first, it must wait until a sufficient amount of ore has been stockpiled so that the mill can run continuously. That is because stopping and restarting a mill is expensive. Ultimately, the rate at which a mine and mill can produce gold is typically controlled by two bottlenecks – the rate at which the mill can process ore, and the rate at which the company can physically extract material from the ground, and in particular, ore for milling.

## PRETIUM ACQUIRES THE BRUCEJACK MINE, AND OVERSEES A CONTROVERSIAL EXPLORATION PHASE MARKED BY CLASHES WITH ITS OUTSIDE XPERT

27. Pretium is in the business of acquiring, exploring and developing of precious metal resource properties in the Americas. On October 28, 2010, Pretium acquired a 100 percent interest in the Brucejack Project, along with the Snowfield Project and other associated assets, from Silver Standard Resources Inc. ("Silver Standard") for an aggregate acquisition price of $450 million, consisting of a cash payment of $233,020,000 and the issuance of a total of 36,163,333 common shares of Pretium.

28. The Brucejack Project, or Brucejack Mine, is located in northwestern British Columbia and is comprised of 4 mining leases and 6 mineral claims currently totaling 3,304 hectares in area. A part of the Brucejack Project, called the Valley of the Kings zone, is the "heart of the Brucejack Project." Pretium proudly proclaims in its public disclosures that it "is

creating *value through gold*." Presently, the Company's business is focused almost exclusively on developing the Brucejack Project.

29. In November 2012, as part of its ongoing development efforts, Pretium released very positive results from a mineral resource estimate that it commissioned from Snowden Mining Industry Consultants ("Snowden") for the Valley of the Kings zone of the Brucejack Project (the "2012 Resource Report"). The 2012 Resource Report estimated that the Valley of the Kings contained indicated gold resources of 16.1 million tonnes[2] at a grade of 16.4 grams per tonne ("g/t") and inferred gold resources of 5.4 million tonnes at a grade of 17.0 g/t. Both the amounts and the grade of the indicated and inferred gold resources supported the view that continued exploration and development of the Brucejack Project ultimately would be very profitable.

30. Determined to substantiate the 2012 Resource Report, Pretium devised the Valley of the Kings Bulk Sample Program (the "Program") to test certain areas of mineralization in order to confirm the accuracy of projected mineral resources. The Program consisted of two elements: (1) excavation of a 10,000 tonne representative bulk sample from the VOK (the "Bulk Sample"); and (2) a 15,000-meter underground drill program. In late 2012, Pretium engaged Strathcona Mineral Services Ltd. ("Strathcona"), a highly respected mining consulting firm, as the Independent Qualified Person ("QP") to oversee and report on the Bulk Sample Program.

31. As Strathcona processed the Bulk Sample, it discovered results that deviated significantly from what Snowden's model predicted – in some instances showing grades and quantities well below the thresholds necessary for mining to be economically feasible – Strathcona advised Pretium to tell investors that "the resource model was not panning out."

[2] "Tonnes" herein refers to a metric ton, equal to 1000 kilograms.

32. Then, in July 2013, the Company announced the discovery of the Cleopatra Vein, an extremely high grade deposit that the company first identified in the 2012 Resource Report. Although Pretium had been aware of the Cleopatra Vein's existence for some time, Pretium immediately began reporting drilling results from this high grade deposit, attempting to convince the market that the results derived from this narrow vein were somehow representative of the entire VOK.

33. Thereafter, Pretium tried to alter the Program so that the Bulk Sample would test more material from the gold-rich Cleopatra Vein and less material from other areas, which contained only lower-grade, less-economically viable material. Specifically, in July 2013, Pretium announced that "[p]lanning is underway with [Strathcona] to increase the portion of the bulk sample tonnage testing the higher grade blocks…," which had been discovered in the Cleopatra vein. In addition, Defendants expanded underground drilling and continued to drill perpendicular to and along the strike of the Cleopatra Vein, increasing the frequency of high-grade intercepts and then announcing the results.

34. In reality, Strathcona disagreed sharply with Pretium's plan to alter the Program, believing that Pretium was attempting to skew the results with an unrepresentative sample. When Strathcona could not be convinced to change course, Pretium reassigned Strathcona's responsibilities for the Program to Snowden, basically allowing Snowden to verify its own model. Specifically, on October 3, 2013, Pretium announced that "[Snowden] independent Qualified Persons are responsible for the review and sign-off of the milling and processing component of the Program."

35. On October 9, 2013, the conflict between Pretium and Strathcona spilled in to public view when Pretium disclosed that Strathcona had abruptly resigned from the engagement.

Defendants also revealed for the first time that "[i]t is expected that approximately 4,000 ounces of gold will be produced in total from the material excavated for the Program, as defined by the Valley of the [2012 Resource Report] for that area of the Valley of the Kings." This amount was nearly 24% ***less*** than the 5,248 ounces initially projected by the 2012 Resource Report.

36. Thereafter, on October 22, 2013, the Company issued a press release explaining the reasons for Strathcona's resignation:

> **[T]here are no valid gold mineral resources for the VOK Zone**, and without mineral resources there can be no mineral reserves, and without mineral reserves there can be no basis for a Feasibility Study …
>
> *[S]tatements included in all recent press releases* [by Pretium] about probable mineral reserves and future gold production [from the Valley of the Kings zone] over a 22-year mine life *are erroneous and misleading*.

37. Pretium criticized Strathcona's conclusions as premature and claimed that Strathcona should have waited for the Program to be complete, even though Pretium itself had been announcing favorable drilling results for months.

38. After Strathcona resigned, Pretium pressed forward with the help of Snowden. Snowden prepared a revised resource estimate in December 2013 (the "2013 Resource Report") that Pretium publicly disclosed. It was a highly positive report that increased the estimated grade and amount of ore at the Valley of Kings site, revealing 8.7 million ounces of gold at a grade of 17.6 grams of gold per tonne.. On June 19, 2014, Tetra Tech, an outside consultant that Pretium hired, provided to Pretium a "Feasibility Study and Technical Report Update on the Brucejack Project, Stewart, BC" (the "2014 Technical Report"). This report updated the 2013 Resource Report, and set forth a detailed plan of how Pretium will develop and operate the mine over its' life, including a detailed timeframe and cost estimates. The report also specified the tonnage of

rock that Pretium will need to drill in the course of developing and operating the Brucejack Mine.

**PRETIUM BEGINS DEVELOPING THE BRUCEJACK MINE**

39. Pretium commenced development on September 5, 2015, according to their 40-F for the year 2015, upon receiving all needed permits from the British of Columbia government. The 2014 Technical Report projected a two year time frame for developing the mine. At the same time, Pretium undertook an "infill drill program". The infield drill program consisted in the extraction and testing of numerous samples of mineral that Pretium extracted from underground tunnels during development.

40. The 2014 Technical Report contemplated that during the two years of development prior to the mine beginning production, Pretium would generate 324 and 343 thousand tons of waste rock from underground excavation in the first and second development years respectively, or an average of 27 thousand tonnes per month in the first year and 28.6 thousand tonnes per month in the second. Pretium reported their actual drilling results in Annual Reclamation Reports ("ARRs") in each year beginning in 2016. As set forth in the ARRs, in 2015, Pretium extracted waste at a rate of 24,435.75 tonnes per month, and in the first quarter of 2016, extracted waste at a rate of 23,174 tonnes per month.

41. However, these same reports indicate that Pretium abandoned their plans set forth in the 2014 Technical Report beginning April 2016. In April 2016, Pretium rapidly increased the pace of drilling, extracting 68,491 tonnes of waste, and for the final nine months of the year averaged 71,363 tonnes extracted, and a total of 711,790. In all, Pretium extracted 998,032 tonnes of rock during the development period, 331,032 tonnes of rock, or 50%m more than planned for in the 2014 Technical Report.

42. Unsurprisingly, then, Pretium's costs for developing the Brucejack Mine significantly exceeded their estimates. The 2014 Technical Report estimated that the total cost for the design, construction, installation, and commissioning of the mine would be $746.9 million USD. Ultimately, the total cost was $772.7 million USD. However, by denominating the costs in US dollars, Pretium significantly understated the true extent to which development exceeded its' budget. As the 2014 Technical Report notes, almost all actual costs are paid in Canadian dollars. And because the Canadian dollar declined between 2014 and 2017, US dollar denominated costs appeared to decline as well. The 2014 Technical Report applied the then-current exchange rate of $0.92 USD per $1 Canadian. The 2018 40-F, which reported the final development costs, used an exchange fate of $0.747 USD per $1 Canadian. Thus, the actual expenses in Canadian dollars reveal much more drastic cost overruns. The 2014 Technical Report's estimate, in Canadian Dollars, was $811.8 million. Pretium actually spent $1.0345 *billion*, or 27% more than expected.

43. This massive, expensive drilling of useless rock at a time where Pretium had no revenues indicate that Pretium had found serious flaws with the plan contemplated in the 2014 Technical Report. It simply makes no sense that a company whose entire success depended on completing mine development as quickly and as cheaply as possible would take such a drastic step to extend the drilling program and extract substantially more rock at substantially greater costs unless they had discovered that their prior mine plan was not economically viable

44. Just months after Pretium initiated this step-up in development, and in stark contrast to their actions behind the scenes, they informed investors that their in-fill drilling program "has confirmed the geological model for the Valley of the Kings, and combined Measured and Indicated Resources have not materially changed." Even as they abandoned their

previous mine plan, Pretium falsely told investors that it had "the mine plan will now be updated in preparation for production development expected to commence later this year." This was a wholly false and misleading statement because it implied Pretium had not already abandoned their mine plan and massively expanded the scope of their development.

**THE BRUCEJACK MINE GOES LIVE, BUT FAILS TO DELIVER**

45. Pretium officially began commercial mine production on July 1, 2017. In quarter after quarer, Pretium failed to deliver the high grade ore to the mill that the 2014 Technical Report contemplated. In 2017 and 2018 the mill processed an average grade of 9.4 g/t and 11.9 g/t respectively. By contrast, the 2014 Technical Report projected that during the first two year of operations, the mine would produce ore with an average grade of 15.3-15.4. The grade was was only 61% of what was promised for 2017, and 77% of what was promised for 2018.

46. Rather than acknowledge that these shortcomings resulted from serious problems that caused Pretium to drastically retool their development plans, they claimed that they would get on track once they completed "the implementation of a grade control system with the target of achieving steady-state production by the end of 2017." Strangely, although they had never referenced any intention of implementing such a system before, they discussed the "grade control system" as though it had already been announced. As they later explained in in their earnings release for 2017, dated March 8, 2018, the "grade control program, designed to refine stope dimensions, reduce dilution and optimize grade, … comprises sampling and drilling." Meaning, the grade control program is a series of steps designed to make sure that Pretium more precisely targets higher grade ore when drilling underground. According to that same release, the reason that 2017's ore was of a lower grade than in their prior models was the lack of the grade control program. However, despite implementing the grade control program in 2018, Pretium again failed to match the promised grades, instead achieving a mere 11.9 g/t.

**VICEROY RAISES THE SPECTER OF EVEN LARGER DISCREPANCIES**

47. The 2017 ARR states that Pretium extracted 483992 tonnes of waste rock in 2017, and 684464 tonnes of ore, a total of 1,171,456 tonnes of rock extracted. However, the 2017 ARR also states that excavated 773,000 m3 of material from the ground at the Brucejack mine, including both ore and waste. As the short seller Viceroy Research noted, in a report dated September 6, 2018 (the "Viceroy Report"), Pretium had previously reported that the average density of rock in the Brucejack mine was 2.78 tonnes per cubic meter. That means that 773,000$m^3$ of rock is equivalent to 2,148,940 tonnes of rock. This raised a serious concern that Pretium was, in reality, extracting much more material, for unknown reasons, than even the weight figures reveal.

48. After Viceroy released the Viceroy Report, on September 10, 2018, Ovsenek released a press release claiming that the information in the 2017 ARR was erroneous. According to that press release, the 773,000$m^3$ figure "includes the total historical volume of all mining to the end of 2017 (including mining done prior to 2017). The correct volume of rock excavated at Brucejack during 2017 is 483,992 m3." Pretium claimed that it had filed an amended ARR with the British Columbia Government on September 10 to correct the error. even if this updated number is true, it confirms that Pretium did in fact drill far in excess of the amount planned in the 2014 Technical Report because, applying the 2.78 tonnes per cubic meter density figure, indicates that Pretium extracted 1,345,497 tonnes of rock in 2017, which, subtracting the 552,205 tonnes of ore that Pretium reported mining in 2017, indicates that Pretium mined 793,292 tonnes of waste in 2017.

**Finally, Pretium Acknowledges it Cannot Match the Rosy Picture of the 2014 Technical Report**

49. Ultimately, Pretium finally abandoned the inaccurate 2014 Technical Report on April 4, 2019, downgrading its estimate of the gold grade in the Valley of Kings to 13.8 g/t, and in the Brucejack mine overall to 12.6 g/t. Pretium claimed that "[t]he 2019 Updates are based on the six quarters of mining operations at Brucejack since commercial production commenced in July 2017. The Valley of the Kings Proven and Probable Mineral Reserve gold grade has been decreased from 16.1 grams per tonne to 13.8 grams per tonne (a 14% decrease) to account for more internal waste than was anticipated in the Company's 2016 Mineral Reserve update."

**Materially False and Misleading Statements Issued During the Class Period**

50. Beginning in July of 2016 and continuing throughout the class period, Pretium repeatedly and falsely claimed that it intended, at the end of 2016, to revise its mine plan to accommodate the results of the drilling program. These statements were all misleading for failing to acknowledge the drastic changes to the mine plan that Pretium had already instituted in April of 2016.

51. On July 21, 2016. Pretium issued a press release, signed by Joseph Ovsenek entitled "Valley of the Kings Positive Mineral Resource Estimate Update" stateing in relevant part:

> Pretium Resources Inc. is pleased to report an updated Valley of the Kings Mineral Resource estimate in accordance with National Instrument 43-101 for its Brucejack Project, where construction and development continues on schedule for commissioning of the underground mine in mid-2017.
>
> *Updated Mineral Resource Estimate Confirms Geological Model for Mine Production Planning*
>
> The 2015-2016 Valley of the Kings infill drill program was undertaken to support production planning in the Valley of the Kings and designed to convert Indicated Mineral Resources into Measured Mineral Resources in the areas to be mined in the first three years of the current mine plan (1320-meter level to 1200-meter level) by increasing drill density to 7.5-meter to 10-meter centers. The program, which consisted of 63,740 meters in 367 drillholes, was successful in increasing the Measured Mineral Resources in the Valley of the Kings by 58% to 1.9 million ounces (3.5 million tonnes grading 17.0 grams per tonne gold).
>
> The program was also successful in adding Indicated Mineral Resources, with Measured and Indicated Mineral Resources in the Valley of the Kings now totalling 9.1 million ounces of gold (16.4 million tonnes grading 17.2 grams per tonne gold), an increase from the December 2013 Valley of the Kings Mineral Resource estimate of Measured and Indicated Mineral Resources which totalled 8.7 million ounces of gold (15.3 million tonnes grading 17.6 grams per tonne gold).

> …
>
> In summary, the updated Mineral Resource estimate has confirmed the geological model for the Valley of the Kings, and combined Measured and Indicated Resources have not materially changed.
>
> …
>
> *Mine Plan Update*
>
> **With the completion of the updated Mineral Resource estimate for the Valley of the Kings and success in increasing confidence in the estimate in the areas to be mined in the first three years, the Valley of the Kings mine plan will now be updated in preparation for production development expected to commence later this year.**

52. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

53. On August 10, 2016, Pretium issued a press release titled "Pretium Reports Second Quarter 2016 Results" stating, in relevant part:

> *Valley of the Kings Mineral Resource Estimate Update*
>
> As a result of the 2015/2016 underground infill drill program, the Valley of the Kings Mineral Resource estimate was updated *(see news release dated July 21, 2016)*. Measured Mineral Resources in the Valley of the Kings increased by 58% to 1.9 million ounces (3.5 million tonnes grading 17.0 grams per tonne gold) and Measured and Indicated Mineral Resources in the Valley of the Kings now total 9.1 million ounces of gold (16.4 million tonnes grading 17.2 grams per tonne gold), an increase from the December 2013 Valley of the Kings Mineral Resource estimate of Measured and Indicated Mineral Resources which totalled 8.7 million ounces of gold (15.3 million tonnes grading 17.6 grams per tonne gold).
>
> In summary, the updated Mineral Resource estimate has confirmed the geological model for the Valley of the Kings, and combined Measured

> and Indicated Resources have not materially changed. The Valley of the Kings remains open to the east and west along strike, and at depth.
>
> …
>
> *Mine Plan Update*
>
> With the completion of the updated Mineral Resource estimate for the Valley of the Kings and success in increasing confidence in the estimate in the areas to be mined in the first three years, **the Valley of the Kings mine plan will now be updated in preparation for production development expected to commence later this year.**

54. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

55. Also on August 10, 2016, Pretium released its financial statements for the third quarter of 2016, together with a Management Discussion and Analysis, that stated, in pertinent part, that:

> *Valley of the Kings Mineral Resource Estimate Update*
>
> As a result of the 2015/2016 underground infill drill program, the Valley of the Kings Mineral Resource estimate was updated (*see news release dated July 21, 2016*). Measured Mineral Resources in the Valley of the Kings increased by 58% to 1.9 million ounces (3.5 million tonnes grading 17.0 grams per tonne gold), and Measured and Indicated Mineral Resources in the Valley of the Kings now total 9.1 million ounces of gold (16.4 million tonnes grading 17.2 grams per tonne gold), an increase from the December 2013 Valley of the Kings Mineral Resource estimate of Measured and Indicated Mineral Resources which totalled 8.7 million ounces of gold (15.3 million tonnes grading 17.6 grams per tonne gold).
>
> In summary, the updated Mineral Resource estimate has confirmed the geological model for the Valley of the Kings, and combined Measured and Indicated Resources have not materially changed. The Valley of the Kings remains open to the east and west along strike, and at depth. The

> foregoing statement was misleading for claiming that Pretium had confirmed the geological model for the Valley of the Kings, when in reality Pretium was already aware that the model was not accurate.
>
> …
>
> With the completion of the updated Mineral Resource estimate for the Valley of the Kings and success in increasing confidence in the estimate in the areas to be mined in the first three years, **the Valley of the Kings mine plan will now be updated in preparation for production development expected to commence later this year.**

56. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

57. On November 3, 2016, Pretium issued a press release titled "Pretivm Reports Third Quarter 2016 Results" and stated, in relevant part:

> *Valley of the Kings Mineral Resource Estimate Update*
>
> During the quarter, the Valley of the Kings Mineral Resource estimate was updated *(see news release dated July 21, 2016)*. Measured Mineral Resources in the Valley of the Kings increased by 58% to 1.9 million ounces (3.5 million tonnes grading 17.0 grams per tonne gold) and Measured and Indicated Mineral Resources in the Valley of the Kings now total 9.1 million ounces of gold (16.4 million tonnes grading 17.2 grams per tonne gold).
>
> The Mineral Resource estimate is based on the results of the underground infill drill program designed to target stope areas in years 1 through 3 of the current mine plan (1320-meter level to 1200-meter level). A total of 63,444 meters was drilled, at 7.5 to 10 meter centers, in 364 drillholes and returned 49 intersections grading greater than 1,000 grams of gold per tonne. This included a bonanza grade intercept in hole VU-722 which encountered 37,117 grams of gold per tonne uncut over 0.5 meters.
>
> In summary, the updated Mineral Resource estimate has confirmed the geological model for the Valley of the Kings, and combined Measured

> and Indicated Resources have not materially changed. The Valley of the Kings remains open to the east and west along strike, and at depth.
>
> *Mine Plan Update*
>
> With the completion of the updated Mineral Resource estimate for the Valley of the Kings and success in increasing confidence in the estimate in the areas to be mined in the first three years, **the Valley of the Kings mine plan will be updated before year-end in preparation for production development.**

58. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

59. On December 15, 2016, Pretium released a press release titled "Pretium Resources Inc.: Positive Valley of the Kings Mineral Reserve Update; Senior Management Changes" that stated, in pertinent part

> *Updated Valley of the Kings Mineral Reserve Estimate and Mine Plan*
>
> Highlights of the updated Mineral Reserve estimate include:
>
> Proven Mineral Reserves in the Valley of the Kings increased to 1.6 million ounces gold (3.3 million tonnes grading 14.5 grams per tonne gold) which is sufficient for the first three years of mine life.
>
> Proven and Probable Mineral Reserves in the Valley of the Kings increased to
>
> 8.1 million ounces gold (15.6 million tonnes grading 16.1 grams per tonne gold).
>
> Areas of gain in the Mineral Reserves are attributed to the following factors:
>
> Increasing drill density to 7.5-meter to 10-meter centers allowed for conversion of a significant amount of Probable Reserve to the Proven

> Reserve category. Mining stopes within the existing Mineral Reserve model along with expansion of the previous Indicated Mineral Resource wire frame accounted for an increase of approximately 620,000 ounces of gold.
>
> …
>
> **Several new, adjacent stopes were added to the previous mine plan as a result of the infill drilling reaching beyond the previously defined ore.** This expansion to the mine plan accounts for an increase of approximately 300,000 ounces of gold.
>
> Adjustments were made to the stope orientation and design parameters, along with the addition of grade to the background mineralization for the estimate which had previously been modeled at zero grade. Estimating waste blocks within the stopes with the July 2016 Mineral Resource estimate grade accounts for an increase of approximately 200,000 ounces of gold.

60. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

61. On February 26, 2017, at a Presentation before the BMO Capital Markets 26th Global Metals & Mining Conference in Hollywood, Florida, Ovsenek responded to an audience question as follows:

> Q: Hi, that 130,000 tonne stockpile — have you guys disclosed what grade that is and then kind of how that's reconciled with the model.
>
> A: Well, we're not disclosing grade of the stockpile and we're not actually giving guidance for '17, our focus is on getting that 2,700 tonnes per day as quickly as we can, and working the bugs out of the mill. **All I can say is that while we're doing our development and we're cutting into the stopes we're expecting to see certain vein types in the stopes and we're seeing those vein types and we're seeing the visible gold so we believe the model is working out the way it should be**. Welcome to come by the core shack tonight, talk to our chief geo. He's responsible for grade control and happy to chat

with you about it.

62. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

63. On March 9, 2017, Pretium released its 2016 annual report that Ovsenek signed. It stated, in pertinent part, that:

> On December 15, 2016, we announced an updated Mineral Reserve estimate for Brucejack's Valley of the Kings deposit, with Proven and Probable Mineral Reserves in the Valley of the Kings increased to 8.1 million ounces gold (15.6 million tonnes grading 16.1 grams per tonne). The Proven Mineral Reserves in the Valley of the Kings increased to 1.6 million ounces gold (3.3 million tonnes grading 14.5 grams per tonne gold) which is sufficient for the first three years of mine life.
>
> …
>
> The updated Mineral Reserves estimate is based on the July 2016 Mineral Resource estimate for the Valley of the Kings. **The July 2016 Mineral Resource estimate was updated based on the 2015-2016 Valley of the Kings infill drill program which consisted of 63,470 meters in 367 drill holes designed to target stope areas to be mined in the first three years of the current mine plan** (1320-meter level to 1200-meter level).

64. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, as modified in December of 2016, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

65. On May 12, 2017, Pretium released its financial statements for the Second quarter of 2017, together with a Management Discussion and Analysis, that stated, in pertinent part, that:

> Valley of the Kings Mineral Reserve Estimate Update

> On December 15, 2016, we announced an updated Mineral Reserve estimate for Brucejack's Valley of the Kings deposit, with Proven and Probable Mineral Reserves in the Valley of the Kings increased to 8.1 million ounces gold (15.6 million tonnes grading 16.1 grams per tonne). The Proven Mineral Reserves in the Valley of the Kings increased to 1.6 million ounces gold (3.3 million tonnes grading 14.5 grams per tonne gold) which is sufficient for the first three years of mine life.
>
> Areas of gain in the Mineral Reserves were attributed to the following factors:
>
> - Increasing drill density to 7.5-meter to 10-meter centers allowed for conversion of a significant amount of Probable Reserve to the Proven Reserve category. Mining stopes within the existing Mineral Reserve model along with expansion of the previous Indicated Mineral Resource wire frame accounted for an increase of approximately 620,000 ounces of gold.
>
> - **Several new, adjacent stopes were added to the previous mine plan as a result of the infill drilling reaching beyond the previously defined ore. This expansion to the mine plan accounts for an increase of approximately 300,000 ounces of gold**.
>
> - Adjustments were made to the stope orientation and design parameters, along with the addition of grade to the background mineralization for the estimate which had previously been modeled at zero grade. Estimating waste blocks within the stopes with the July 2016 Mineral Resource estimate grade accounts for an increase of approximately 200,000 ounces of gold.
>
> **The updated Mineral Reserves estimate is based on the July 2016 Mineral Resource estimate for the Valley of the Kings. The July 2016 Mineral Resource estimate was updated based on the 2015-2016 Valley of the Kings infill drill program which consisted of 63,470 meters in 367 drill holes designed to target stope areas to be mined in the first three years of the current mine plan** (1320-meter level to 1200-meter level). *(See news release dated July 21, 2016.)*

66. The foregoing statement was materially misleading for claiming that Pretium was at that time following the mine plan it had set forth in 2014, as modified in December of 2016, whereas in reality Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable.

67. On Jaunary 23, 2018, Pretium issued a press release stating, in pertinent part, that:

> **During and prior to the second half of 2017, underground development focused on establishing sills and opening levels laterally at the Brucejack Mine in support of the long-term mine plan, which will provide optionality in mining stopes.** Access to the broadest possible range of stopes will maximize stope blending and is expected to improve the management of production grades as the ramp-up continues at the Brucejack Mine. In the third quarter of 2017, underground development established a sill on the 1320-meter Level of the Brucejack Mine, the first of two sills planned for the first year of mining at Brucejack. During the third quarter and through the fourth quarter, underground development established a sill at the 1200-meter Level of the mine, and work continued on the lateral development to the east and west.

68. The foregoing statement was misleading for falsely claiming that Pretium had adhered to its mining plan during and prior to the second half of 2017, whereas in reality they had wholly abandoned that plan because it was unviable.

69. On March 9, 2018, Pretium filed its consolidated financial statements for the year ended December 31, 2017, along with Management Discussion and analysis. It stated, in pertinent part, that:

> Grade reconciliation to the reserve model for the period August 1, 2017 to December 31, 2017 was approximately 75% to 80% and attributed to: (a) the small, relatively unrepresentative sample size of production being analyzed, (b) rudimentary grade control without the grade control program operational and (c) lack of drill density in a significant area of the contributing stopes. During the period, ore from the stopes developed on the 1200-meter Level sill provided approximately 25% of mill feed. **These stopes were mined in establishing the 1200-meter Level sill as part of the long-term mine plan and had a lower drill density than stopes on other levels of the mine.** As the grade control program becomes operational and mining moves up from the 1200-meter Level into areas with higher drill density, reconciliation is expected to be more robust.

70. The foregoing statement was materially misleading for failing to disclose that Pretium had drastically altered its plans by April of 2016 because the mining plan set forth in the 2014 Technical Report was unviable..

**DEFENDANTS' FRAUD CAUSED PRETIUM'S STOCK PRICE TO DECLINE**

71. On January 23, 2018 Pretium issued a press release that revealed that, in the 4th quarter of 2017, the ore that Pretium milled had a grade of only 7.34 grams per tonne, falling far short of the 2014 Technical Report's projections of 15.3 grams per tonne for ore that Pretium milled in the first year. On this news, the Company's share price fell $2.86 per share, or over 26%, to close at $7.93 per share on January 23, 2018, on unusually heavy trading volume. These disappointing results and consequent share price decline were a direct consequence of Preitium's mine plan having failed and been unviable as early as April 2016.

72. On April 11, 2018, Pretium reported its first quarter 2018 production results, disclosing that the grade of ore that Pretium milled was 9.1 grams per tonne. On this news, the Company's share price fell $0.76 per share, or over 26%, to close at $7.51 per share on April 12, on unusually heavy trading volume These disappointing results and consequent share price decline were a direct consequence of Preitium's mine plan having failed and been unviable as early as April 2016.

73. On September 6, 2018, Viceroy Research published a report entitled "Pretium Resources – digging up dirt," alleging, among other things, that the Company's "mining results have been distorted." Specifically, the report brought to investors' attention the fact that the 2017 ARR showed that Pretium is moving far more tonnage from its underground mine than it had disclosed to investors or than it should have in the plan set forth in the 2014 Technical Report. "This suggests [Pretium's] reported grades and reserves are significantly inflated, a much greater amount of waste is being dumped into local lakes, and more explosives are being utilized [than

set forth in the 2014 Technical Report]. Pretium's operational plan has experienced dramatic changes in a short amount of time, leading us to believe that management is scrambling to find consistent, high- grade ore to maintain the charade that its debt and equity are viable."

74. On this news, the Company's share price fell $0.77 per share, or approximately 10%, to close at $6.94 per share on September 6, 2018, on unusually heavy trading volume. This share price decline occurred because investors learned for the first time that Pretium's mine plan was not viable, and that Pretium had altered the plan in a desperate attempt to find sufficient high grade ore, but had failed.

## ADDITIONAL SCIENTER ALLEGATIONS

### Additional Allegations of Ovsenek's Scienter

75. Ovsenek's scienter can be inferred from his statements admitting during the class period that he was aware of the details of the results of Pretium's testing programs and the then-current state of the mine's development. Ovsenek stated, on February 26, 2017 "while we're doing our development and we're cutting into the stopes we're expecting to see certain vein types in the stopes and we're seeing those vein types and we're seeing the visible gold so we believe the model is working out the way it should be. Welcome to come by the core shack tonight, talk to our chief geo. He's responsible for grade control and happy to chat with you about it." Ovsenek thereby confirmed that he had personal knowledge of the status of the quality and quantity of gold produced in the Brucejack mine and whether the results that Pretium saw during the development of the mine matched.

76. Moreover, Ovsenek, responding to Viceroy's report, falsely claimed that all of Pretium's numbers were accurate. On September 6, in response to the Viceroy Report, Ovvsenek insisted "We stand by all our numbers." However, less than one week later, Pretium was forced to admit that it had included inaccurate numbers in the 2017 ARR submitted to the British Columbia government.

77. Finally, further supporting Ovsenek's scienter is the fact that he was well aware that the 2014 Technical Report was highly controversial, with Strathcona accusing Pretium of outright fraud for relying on the reserve estimates are in the 2014 Technical Report. He was therefore on notice that a highly respected professional mining consultant considered the results highly suspect and that the Technical Report should be subject to serious scrutiny.

## CLASS ACTION ALLEGATIONS

78. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Pretium securities between July 21, 2016 and September 6, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

79. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pretium's common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Pretium common stock were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Pretium or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

81. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

82. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Pretium; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

83. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

84. Plaintiffs are entitled to rely on the Fraud on the Market presumption of reliance because at all relevant times, the market for Pretium's securities was an efficient market for the following reasons, among others:

(a) Pretium shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Pretium filed periodic public reports with the SEC;

(c) Pretium regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Pretium was followed by more than 12 securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(e) On average, approximately 5% of Pretium's outstanding stock traded weekly.

85. As a result of the foregoing, the market for Pretium's securities promptly digested current information regarding Pretium from all publicly available sources and reflected such information in Pretium's share price. Under these circumstances, all purchasers of Pretium's securities during the Class Period suffered similar injury through their purchase of Pretium's securities at artificially inflated prices and a presumption of reliance applies.

86. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

87. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Pretium who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Pretium and Ovsenek**

88. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

89. During the Class Period, Defendants Pretium and Ovsenek carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Pretium's securities at artificially

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

90. Defendants Pretium and Ovsenek (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Pretium's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

91. Defendants Pretium and Ovsenek, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Pretium's financial well-being and prospects, as specified herein.

92. Defendants Pretium and Ovsenek employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pretium's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Pretium and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

93. Ovsenek's primary liability and controlling person liability arises from the following facts: (i) Ovsenek was a high-level executive at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) Ovsenek, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Ovsenek enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

94. Ovsenek had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Pretium's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Pretium's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Pretium and Ovsenek, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Pretium and Ovsenek, but not disclosed in public statements by Pretium and Ovsenek during the Class Period, Plaintiffs and the other members of the Class acquired Pretium's securities during the Class Period at artificially high prices and were damaged thereby.

96. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Pretium was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Pretium securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

97. By virtue of the foregoing, Defendants Pretium and Ovsenek violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98. As a direct and proximate result of Defendants Pretium and Ovsenek's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

99. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

100. Individual Defendants acted as controlling persons of Pretium within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

102. As set forth above, Pretium and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Dated: June 25, 2019

Respectfully submitted,
**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Stern
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Jonathan Stern, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jstern@rosenlegal.com

*Counsel for PlaintiffS*